LOIS SZLAFRAK *v.* BETTY O. DONALDSON.

[No. 570A80.  Filed June 30, 1971.]

*Myron J. Hack, Robert L. Stephen,* of South Bend, for appellant.

*R. Kent Rowe,* of South Bend, for appellee.

WHITE, J.—This is an appeal from a judgment based on a defendant's verdict directed by the trial judge. Plaintiff-appellant, a pedestrian admittedly voluntarily intoxicated, was in the east-bound traffic lane of LaSalle Street, South Bend, at night time when she was struck and injured by an east-bound automobile being driven by appellee-defendant. Pursuant to a pre-trial order the case was tried on the theory of last clear chance. Remarks by the trial judge at the time he directed the verdict disclose that he was convinced that there was no evidence on which the jury could have found that defendant, when she discovered plaintiff in a position of peril could have avoided the collision. In the trial court's words, "there is absolutely no evidence upon which the Jury could make a determination that having discovered the Plaintiff . . . [in] a position of peril, that she had the time to do anything about it."[1]

---

1. "The statement or opinion made by the trial judge was clearly a part of the proceedings of the trial of this cause as the same occurred concurrently with the court's ruling on the motion for a new trial." *Rans* v. *The Pennsylvania Railroad Co.* (1962), 133 Ind. App. 592, 597, 181 N. E. 2d 644, 647. If it does not have the same controlling effect as a statement of reasons for sustaining a motion for new trial, *Landers* v. *McComb Window and Door Co. Inc.* (1969), 145 Ind. App. 38, 248 N. E.

Appellant not only asserts that the trial court was in error in directing the verdict, but that it also committed reversible error by sustaining defendant's objection to a question when defendant's deposition, taken by plaintiff, was read into evidence. We find no reversible error in either ruling.

Since plaintiff-appellant remembers nothing which occurred after she started to cross the street, substantially all the evidence bearing on the question of whether defendant-appellee did have the last clear chance to avoid the injury is to be found in defendant's testimony. Her pre-trial deposition was read by plaintiff at the trial and she was also called to the witness stand and questioned by plaintiff's counsel on direct examination during the trial. So far as pertinent to the problem, her testimony by deposition was:

Defendant was returning home from playing cards at a friend's home. The night was cold but there was no snow. The mist was heavy and the pavement was wet. She was driving east on LaSalle Street and stopped at a red light one block west of the intersection of LaSalle and St. Louis where the accident occurred. As she started up and drove to the point of accident she was looking straight ahead, and traveling twenty-five to thirty miles per hour.

At this point it becomes impossible to make a meaningful and fair statement of her testimony in narrative form. The questions and answers read from the pre-trial deposition which bear directly on the time interval between discovery and collision are:

"Q   Can you tell us exactly how this accident occurred? When did you first see the pedestrian, to start with?

A   Well, she turned and looked at me. I saw her standing there.

2d 358, 18 Ind. Dec. 72; *Holcomb* v. *Miller* (1971), 149 Ind. App. 46, 265 N. E. 2d 61, 24 Ind. Dec. 111, the trial judge's statement here nevertheless "may [as may a trial court's written opinion] be considered on appeal in order to determine the meaning and effect of the trial court's decision." *Smeekens* v. *Bertrand* (1969), 144 Ind. App. 656, 248 N. E. 2d 48, 49, 17 Ind. Dec. 724, 725, n. 1.

Q   And where was she and where were you when you saw her?

A   Well, about approximately two car lengths across the intersection.

Q   Two car lengths across the intersection?

A   Yes.

\* \* \*

Q   And when you say you saw her, the two car lengths you mentioned, that was about how far away that the front of your car was from her?

A   That's how far I was across the intersection.

Q   Two car lengths across the intersection?

A   Approximately, yes, south.

\* \* \*

Q   Let me put it this way. Did you see the pedestrian at any time before you collided with her?

A   No.

Q   You didn't see her until after she had been struck, is that it?

A   No, I looked—I was driving, and there she was, and she turned and looked at me, and there she was.

\* \* \*

Q   I believe you said that upon seeing her, she looked at you and then you applied your brakes, is that correct?

A   Yes.

Q   Did you then also steer your vehicle to the left?

A   I stopped dead still, just stopped. The brakes stopped. The brakes stopped, but I don't remember.

Q   And I believe you said you were going about 30 miles an hour?

A   Yes.

Q   Did you steer your vehicle to the left as you were braking?

A   I don't remember.

Q   Upon applying your brakes, did they function properly; that is, did they work properly mechanically?

A   Yes.

Q   What if anything transpired with respect to the wheels; did they lock and a skid develop?

A   I don't remember.

Q Upon seeing the pedestrian and prior to the impact, did you sound your horn at any time?

A I can't say, because I don't remember.

\* \* \*

Q To summarize, I think you said you looked, and there she was, and you applied your brakes?

A Yes.

Q And then the collision occurred?

A Yes."

When she was called to the stand and testified in court, her testimony pertinent to the time interval was this:

"Q When did you first see the pedestrian in question?

A It happened in a split second. I am driving one second, she wasn't there, the next half a second she was there and I hit my brakes.

\* \* \*

Q Now, as you came down East LaSalle Street, can you tell the jury, can you place on that diagram there where Mrs. Szlafrak was located when you first saw her?

A When I first saw her?

Q Yes, Mam?

A It was a split second, it was so fast. I had crossed the intersection and approximately here (indicating), approximately, I can't give you a definite thing. I had crossed the intersection, I know, and I saw her and I hit my brakes, but there were cars all along this side of the street. (indicating).

\* \* \*

Q She already had removed herself, had she not, from where the cars were parked?

A She was just stepping, I believe. It happened so fast I can't tell you exactly because I couldn't see her.

Q I didn't quite understand you. Did you say that she was stepping, I believe. Do you know whether or not she was stepping or whether she was stationary?

A I don't know, it happened so fast. It all happened in a split second, I couldn't tell you.

Q Did you ever see her move at all?

A I don't remember; I just don't remember.

Q   Were you able to notice any movement of her head?

A   It seems as though she—when I looked at her she was looking right at me.

Q   You saw her eyes, did you?

A   I saw her face.

Q   And how long a time was your sight placed upon her face?

A   I couldn't tell you that. As soon as I saw her face I hit my brakes.

* * *

Q   Do you know how quickly you reacted after you saw Mrs. Szlafrak.

A   Right away to my knowledge.

Q   In terms of seconds, how much or how long would right away mean?

A   Split second.

Q   One whole second or two whole seconds?

A   It was so fast—I'll say a split second when I hit my brakes. I hit them right away.

Q   Your car was moving thirty miles an hour?

A   Between twenty-five and thirty.

Q   Would it be fair to say that the split second time that it took you when you first observed Mrs. Szlafrak until you were able to put your foot on the pedal, the car went a distance of eight feet?

A   It skidded.

Q   I'm talking about before you hit the brakes?

A   I don't know, I couldn't tell you. I hit my brakes right away.

Q   I don't believe that you understand my question.

A   I don't.

Q   I'm not trying to be difficult Mrs. Donaldson. You said that it was a split second before you were able to hit you brakes. That is normal would it not be?

A   I imagine.

Q   No one can move simultaneously?

A   No.

Q   This is a simple element when you first see and observe and [sic] object before you get your foot to move up to the brake pedal, is it not?

A   Yes.

Q   Another time element before you're able to depress or push in on the brake pedal, right?

A   Yes.

Q   Admittedly, this or these are small motions of time?

A   Right.

Q   And would you say to the best of your recollection this would be a split second, right?

A   That is right.

* * *

Q   Before you applied your brakes, may there be a time when you froze?   (objection by Appellee's counsel overruled)

A   Well, I wouldn't exactly say that I froze.  Maybe I used the phrase "froze" in that split second and I hit my brakes and stopped and I probably sat there and I probably did freeze for half a second, but I immediately got out of the car to see about her.

Q   You say that you used that phrase?

A   In my explanation of things I think that I froze, but I never lost control of the car."

Defendant-appellee has correctly stated the test a trial court must apply when deciding whether to direct a verdict.  It is found in *Sparks* v. *Baldwin* (1965), 137 Ind. App. 64, 68, 205 N. E. 2d 173, 176, as follows:

"The law is that 'a verdict should be directed where there is a total lack of *substantial evidence* of *probative value,* a total lack of evidence not being required.'  Flanagan, ██ Wiltrout and Hamilton, *Indiana Trial and Appellate Practice,* 1963 Pk. Supp., § 1661, Comment 1.  Further, our Supreme Court, in *Whitaker, Admr.* v. *Borntrager* (1954), 233 Ind. 678, 122 N. E. 2d 734, cited with approval authorities which have held that a directed verdict in favor of a defendant is proper 'where the evidence is without conflict and is susceptible of but one inference and that inference is in favor of the defendant.' "   (Emphasis in original.)

It must be noted that want of conflict in the evidence standing alone is insufficient to justify the direction of a verdict.

Such evidence must also be susceptible of but one inference—an inference favorable to the defendant. As was said in a different context in *Cole* v. *Sheehan Construction Company* (1944), 222 Ind. 274, 280, 53 N. E. 2d 172, 175:

". . . [I]t does not necessarily follow that there was no conflict in the evidence merely because the testimony was undisputed. A conflict may arise out of the testimony of a single witness, though it is not disputed by any other testimony."[2]

A witness need not make inconsistent statements for there to be a conflict in his testimony. Such conflicts usually arise out of the possibility that the same statement may convey entirely different meanings to different listeners depending on the inference drawn by the listener. If the statement is susceptible of two or more reasonable inferences, there is a conflict in the testimony.

In ruling on the motion for directed verdict all conflicts in the evidence must be resolved against the moving party. This includes "draw[ing] against the party requesting such instruction, all inferences which the jury might reasonably draw. [citations omitted.] Likewise, . . . the court will not weigh the conflicting . . . inferences. . . ." *Callahan* v. *New York Central Railroad Company* (1955), 125 Ind. App. 631, 635, 125 N. E. 2d 263, 265. "If facts are susceptible of two different inferences then it is the province of the jury to determine which the facts proved." *Boswell* v. *Washington* (1966), 140 Ind. App. 273, 279, 221 N. E. 2d 184, 187, 9 Ind. Dec. 346, 350.

---

2. *Cole* v. *Sheehan, supra,* illustrates that at all levels the difficulty in distinguishing between the function of finding the facts and the function of determining the sufficiency of the evidence is a problem fraught with error. There the "Appellate Court found that the undisputed evidence produced by the appellant [in support of her workmen's compensation dependency claim before the Industrial Board] established that she and decedent were husband and wife . . . [etc.]." (222 Ind. at 280, referring to our opinion at 51 N. E. 2d 391.) This, said the Indiana Supreme Court was an invasion of the province of the Industrial Board. "The statute does not contemplate that the functions of the Industrial Board may be assumed by the courts." (222 Ind. at 281.)

It is not denied that the evidence we have recited was susceptible of the inference that when defendant discovered plaintiff's peril she did not have the means (for want of time) to avoid injuring her. Our problem is to determine whether it was also susceptible of the opposite inference—the inference that she did have time to avoid the collision.

Appellant's counsel has summarized his primary argument to that effect as follows:

> "Although she used the term 'split second,' Mrs. Donaldson's testimony was that at least *some time* elapsed between sighting the Plaintiff-Appellant and Mrs. Donaldson's application of the brakes; the jury could have found or inferred that the term 'split second' is meaningless and that at least several seconds (considered as measurements of time) necessarily elapsed; for there was time to lay down four or five feet of skid marks on a wet pavement."

We are quite willing to agree that the jury *could have* inferred that, as used by defendant in her testimony, the term "split second" is meaningless. To find it meaningless is to disregard it. And to disregard it is to leave the jury with no evidence from which to infer the time interval but such expressions as "right away," "it all happened so fast," and "[a]s soon as." If those expressions are any more meaningful than "split second," their only possible meaning, in the context of the testimony as we have set it out above, is that she reacted to the sight of Mrs. Szlafrak by applying her brakes within normal and usual reaction time; that it all happened so fast she could not avoid the collision. This is not merely the best inference, or the most reasonable inference, that the jury could draw from Mrs. Donaldson's testimony. It is the only inference that reasonable men would draw.

The jurors could have believed that Mrs. Donaldson was not telling the whole truth; that she remembered more than she admitted; that she was deliberately falsifying or that what she believed to be the fact was probably not the fact. There is ample authority to the effect that jurors can refuse to be-

lieve the affirmative testimony of a sole witness in support of an issue, thus leaving it unproved. *Calvert* v. *London* (1965), 137 Ind. App. 595, 598, 210 N. E. 2d 376, 378. But we know of no authority that a jury may convert negative testimony to affirmative testimony because the negation is unconvincing.

Appellant's alternative argument is: "If a 'split second' means at least *one* second, and if an automobile moving at 30 miles per hour travels 44 feet in one second, Mrs. Donaldson did have *time* to avoid striking . . . Mrs. Szlafrak had she veered only slightly to the left. . . ." Appellant had even calculated that a turn of the wheels one inch to the left, *"if done at the moment of sighting the plaintiff,"* would have avoided the collision.

One of the fatal infirmities in counsel's mathematical formula is that the record is devoid of evidence from which the jury could reasonably have believed that Mrs. Donaldson was saying "one second" or "several seconds" when she said "split second" or "right away" or any of the other similar expressions she used. In her very first use of the term "split second" in her in-court testimony quoted above, she clearly negated any such implication. She there said:

> "It happened in a split second. I am driving one second, she wasn't there, the next *half a second* she was there and I hit my brakes." (Our emphasis.)

This use of the term and her subsequent uses are all consistent with the dictionary definition of "split second" as

> ". . . a fractional part of a second. Any almost imperceptive period of time. Synonym—flash, instant." Webster's New International Dictionary (3rd ed. 1961).

On that authority we judicially note that the expression "split second" is commonly used to indicate a period of time less than a full second. In the absence of anything in the record which would create a reasonable basis for believing that the witness used it here with intent to convey any other meaning, there would be no basis for an inference by the jury that "split

second" meant one second or several seconds. To reach such a conclusion from appellee's testimony would be mere speculation and surmise.

We are forced to the conclusion that the trial judge correctly evaluated the evidence when he held "that there is absolutely no evidence upon which the Jury could make a determination that having discovered the Plaintiff is [in] a position of peril, that she had the time to do anything about it."

Because plaintiff-appellant also contends that the trial court erred in excluding certain evidence, we now examine it to determine whether if added to the evidence already considered, it would have made a *prima facie* case for plaintiff. Unless it would, its exclusion was harmless.

Plaintiff's attorney asked the defendant: "Was there anything other than your reaction time that prevented you from turning to the left across the center line of LaSalle Street in order to avoid contacting her?"

The answer was: "I just froze; that happened so fast I don't remember."

That question was asked and answered during the taking of defendant's pre-trial deposition. The objection was made and sustained when the deposition was read to the jury at the trial. Defendant's testimony, both by deposition and in person, so far as it relates to whether she had an opportunity to avoid the accident when she discovered plaintiff's peril, has already been repeated in monotonous detail.

The excluded evidence and the admitted evidence, whether considered separately or as a whole, is susceptible of the reasonable inference that when defendant saw plaintiff she (defendant) failed to act as a reasonably prudent person would have acted under the same or similar circumstances.[3] But we fail to find anything in the naked admission, "I just froze," which implies what length of time the freeze endured. Nor

3. We assume, *arguendo*, that a jury could find that a reasonably prudent person driving an automobile would not become paralyzed by emotion in such circumstances.

when the whole sentence is read together is there basis for any inference that defendant had time to avoid the accident, yet failed to do so because she "froze." At most it arouses a suspicion which can ripen into an inference only when there is evidence of a time interval of sufficient duration that the "freeze" would have been a cause of the accident. Whether it was error to sustain the objection to the question is therefore of no consequence.

The judgment of the trial court is affirmed.

Hoffman, C.J., and Staton, J., concur; Sharp, J., not participating.

NOTE.—Reported in 271 N. E. 2d 170.